## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FRAZIER CAUDLE, et al.,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>  **Defendant.** | **Civil Action 08-00205 (HHK)** |

## MEMORANDUM OPINION AND ORDER

In June and July of 2010, a three-week jury trial was held in this case.  The jury returned a verdict for plaintiffs Frazier Caudle, Nikeith Goins, William James, Sholanda Miller, and Donald Smalls, concluding that the District of Columbia Metropolitan Police Department ("MPD") had retaliated against plaintiffs in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  The District now moves for judgment as a matter of law, a new trial, and remittitur of the jury's award of damages to four of the five plaintiffs [#297].  Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion must be denied.

## I.  BACKGROUND

In the summer of 2006, the five plaintiffs were members of the MPD First District Focus Mission Unit ("FMU"), a specialized plainclothes unit composed of "productive" patrol officers who "graduated to" FMU duty.  *See* Trial Tr. 165–66, 169, June 15, 2010 (test. of Capt. Ralph McLean).  Goins was part of the FMU's auto theft section; the other plaintiffs were part of its vice unit.  After Lieutenant Ronald Wilkins took charge of the FMU, plaintiffs, who are African

American, came to feel that they were being treated differently from their Caucasian colleagues. They believed that Wilkins, who is Caucasian, was discriminating against them because of their race. *See, e.g.*, Trial Tr. 111, June 28, 2010. After a failed attempt to meet with the First District Commander, Diane Groomes, about Wilkins's behavior, Caudle, James, Miller, and Smalls enlisted the help of Caudle's fiancé, an attorney, in drafting an anonymous letter to Groomes expressing their concerns about Wilkins. *See* Trial Tr. 22–23, June 15, 2010; Trial Tr. 124–25, June 30, 2010. The letter was sent to Groomes on June 16, 2006. *See* Pls.' Opp'n Ex. 20 (unsigned letter to Diane Groomes, June 16, 2006). Goins, who was not involved in the production of the unsigned letter, complained orally to Wilkins about Wilkins's conduct on numerous occasions. Trial Tr. 113, June 28, 2010.

On June 25, Officer Chanel Howard, also a member of the FMU, sent an email to Groomes expressing her belief that Caudle, James, Miller, and Smalls were behind the anonymous letter. Trial Tr. 17–18, June 21, 2010; Trial Tr. 23–24, June 22, 2010. Wilkins likewise speculated that those officers were responsible for the letter. Trial Tr. 28–30, June 24, 2010. Shortly after receiving the letter, Groomes called a meeting of all FMU officers, at which she "explained to them that [she] was in receipt of a letter of complaint and went over parts of what the complaint was." Trial Tr. 19, June 22, 2010. After discussing the complaint, Groomes asked the FMU officers whether "they could work together as a unit." Trial Tr. 21, June 22, 2010. During the meeting, many of the FMU officers spoke; according to plaintiffs, the other officers appeared to know who was behind the unsigned complaint, and many officers "t[ook] shots at" plaintiffs. Trial Tr. 130, June 30, 2010.

Soon thereafter, Groomes decided to require the FMU officers to submit applications to

2

remain in the unit, an apparently unprecedented step that she described as motivated by performance concerns.  Trial Tr. 24–25, June 22, 2010.  Caudle, James, Smalls, and Goins each submitted an application to remain in the FMU.  Trial Tr. 51, June 15, 2010; Trial Tr. 115, June 28, 2010; Trial Tr. 34, 134, June 30, 2010.

Plaintiffs were concerned that the reapplication process was a ruse designed to allow their removal from the unit because of their complaints about Wilkins.  While the applications were pending, Caudle, James, Miller, and Smalls, who had for some time patrolled together in an unmarked car, were forced to split up and ride with other officers.  Trial Tr. 44–45, June 15, 2010; Trial Tr. 32–33, 131, June 30, 2010.  They were also excluded from certain FMU operations.  Trial Tr. 42, June 15, 2010; Trial Tr. 131–33, June 30, 2010.  Believing these changes to be retaliatory, all five plaintiffs, along with Greg Philpotts, another FMU officer, drafted (and signed) a second written complaint, which they sent to the D.C. Office of Human Rights and the U.S. Department of Justice on August 24, 2006.  *See* Pls.' Opp'n Ex. 29 (August 24, 2006 written complaint).

When the reapplication process was complete, each plaintiff's application was denied, and each was replaced by an officer from the patrol unit.  Trial Tr. 41, 139–40, June 30, 2010.  Plaintiffs, who had been praised by their supervising sergeants as effective and capable officers, *see, e.g.*, Trial Tr. 206–09, June 24, 2010, were devastated.  *See, e.g.*, Trial Tr. 120, June 28, 2010.  Caudle, who had previously been named FMU Officer of the Year, was sent back to the patrol unit, which he found "embarrassing and humiliating."  Trial Tr. 41, June 30, 2010.  James, Smalls, and Goins were assigned to a newly created "Intel" unit, of which they were the only members.  Trial Tr. 143–44, June 30, 2010.  The Intel unit was eventually dissolved, and James,

Smalls, and Goins were returned to patrol positions.  Trial Tr. 92, June 15, 2010.  Miller, who

had previously requested a transfer to the patrol day shift to allow her to care for her child, Trial

Tr. 44, June 21, 2010, was instead assigned to the patrol evening shift.  Trial Tr. 74, June 21,

2010; Trial Tr. 121, June 22, 2010.

Believing all of these events to constitute retaliation for their complaints of

discrimination, plaintiffs filed this action against the District in February 2008.  In June and July

of 2010, a jury heard eleven days of testimony.  The jury found for plaintiffs, awarding Caudle

and Goins $200,000 each, James and Smalls $250,000 each, and Miller no damages.

## II.  LEGAL STANDARDS

### A.     Motion for Judgment as a Matter of Law Under Rule 50

Under Federal Rule of Civil Procedure 50, "[i]f a party has been fully heard on an issue

during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment

as a matter of law against the party." FED. R. CIV. P. 50(a)(1)(B).  Because, however, "a

judgment as a matter of law intrudes upon the rightful province of the jury, it is highly

disfavored." *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994); *accord Breeden v. Novartis*

*Pharm. Corp.*, 2011 WL 2652432, at *8 (D.C. Cir. July 8, 2011).  Accordingly, the Court's task

in ruling on such a motion "is limited to evaluating whether [the nonmovant] proffered

'sufficient evidence upon which a jury could properly base a verdict' for" the nonmovant.

*Boodoo*, 21 F.3d at 1161 (quoting *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 828

(D.C. Cir. 1988)) (emphasis omitted).  The Court "neither assesses witness credibility nor weighs

evidence." *Id.* (citing *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C. Cir. 1983)). If a reasonable jury could have found for the nonmovant, the motion must be denied. *See Breeden*, 2011 WL 2652432, at *8 (citing *Conseil Alain Aboudaram, S.A. v. de Groote*, 460 F.3d 46, 50 (D.C. Cir. 2006)).

## B.     Motion for a New Trial Under Rule 59

Rule 59 provides that, after a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Under this standard, "[t]he decision to grant or deny such a motion lies within the sound discretion of the court." *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 87 (D.D.C. 2006) (citing *Grogan v. Gen. Maint. Co.*, 763 F.2d 444, 448 (D.C. Cir. 1985); *Machesney v. Larry Bruni, M.D., P.C.*, 905 F. Supp. 1122, 1130 (D.D.C. 1995)). And, to protect the province of the jury, "such a motion should be granted only when the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'" *Id.* (quoting *Warren v. Thompson*, 224 F.R.D. 236, 239 (D.D.C. 2004)). "[M]inor evidentiary errors" will not warrant a new trial. *See id.*

## C.     Motion for Remittitur

"In reviewing the actual amount of a jury's award, [the Court's] task is limited and a reluctance to interfere is [its] touchstone." *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1238 (D.C. Cir. 1984). Therefore, a jury's award will be reduced only where "(1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate."

*Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002) (citing *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 96 (D.C. Cir. 1987); *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1085 (D.C. Cir. 1974)). And "[a] court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (citing *Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir. 1991)). The burden of establishing that the jury's award was excessive rests with the party challenging it. *See Carter*, 727 F.2d at 1239.

### III. ANALYSIS

**A.      Judgment as a Matter of Law**

The District first moves for judgment as a matter of law, arguing that plaintiffs failed to present evidence sufficient to establish any of the three elements of a Title VII retaliation claim: protected activity, materially adverse action, and a causal connection between the two. Def.'s Mem. in Supp. of Mot. for J. as a Matter of Law, New Trial, and Remittitur ("Def.'s Mem.") at 10; *see Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006); *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002). The Court will consider each element in turn.

**1.      Protected Activity**

Title VII protects two types of activity: opposition activity (opposing "any practice made an unlawful employment practice by" Title VII) and participation activity (making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII). 42 U.S.C. § 2000e-3(a); *see also Crawford v. Metro. Gov't of Nashville &*

*Davidson Cnty.*, 555 U.S. 271, —, 129 S. Ct. 846, 850 (2009).  Here, plaintiffs contend that their

trial evidence established at least four different protected activities: "(a) complaining of

discrimination by the June 16, 2006 letter complaint; (b) orally complaining of race-based

disparate treatment; (c) submitting [the] August 24, 2006 written complaint of discrimination and

retaliation; and (d) filing formal charges of discrimination in the fall of 2006."  Pls.' Opp'n at 10.

To begin with, the unsigned June 16 letter sent to Groomes by Caudle, James, Smalls,

and Miller clearly constituted protected activity: the letter expressly complained of racially

motivated disparate treatment, *see* Pls.' Opp'n Ex. 20 (unsigned letter to Diane Groomes, June

16, 2006), and "Title VII protects informal complaints such as letters."  *Mansfield v. Billington*,

432 F. Supp. 2d 64, 73 n.3 (D.D.C. 2006).  The District contends that the letter cannot be

protected because Groomes never learned who wrote it, Def.'s Mem. at 13, but an employer's

knowledge of an employee's protected activity does not impact whether that activity is protected;

rather, employer knowledge is properly considered as part of the causal-connection inquiry.  *See,*

*e.g.*, *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 13 (D.D.C. 2006).  Thus, the Court

will address this argument below, when it discusses the causal-connection element.  *See infra*

section III.A.3.a.[1]

Likewise, the jury had a sufficient evidentiary basis to conclude that Goins (who was not

involved in the drafting of the June 16 letter) engaged in protected activity.  Goins testified at

---

[1]       Plaintiffs also understand the District to challenge the protected status of the June
16 letter on the ground that plaintiffs did not themselves write it, but rather asked Caudle's then-
fiancé, an attorney, to do so on their behalf.  It is unclear to the Court whether the District
actually makes such an argument; regardless, the fact that the letter was drafted on plaintiffs'
behalf by a third party is irrelevant.  *See Singletary v. District of Columbia*, 351 F.3d 519, 525
(D.C. Cir. 2003) (finding "no doubt" that letters drafted by the plaintiff's attorney "constituted
protected conduct under Title VII").

trial that he complained regularly about Wilkins's "unfair treatment" directly to Wilkins.  *See*

Trial Tr. 113, June 28, 2010 ("Whenever I felt unfair treatment, I would speak up all the time.").

The District points out that, although Goins complained of "unfair treatment," he never referred

expressly to racial bias while doing so.  *See* Trial Tr. 38–39, June 29, 2010.  And the District

rightly observes that, to be protected by Title VII, a "complaint must *in some way* allege unlawful

discrimination."  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (emphasis

added).  But no "magic words" are required, *id.*; rather, "the communication of a complaint of

unlawful discrimination . . . may be *inferred* or *implied* from the surrounding facts."  *Mazloum*,

442 F. Supp. 2d at 13 (quoting *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 790 (D.C.

2001)) (omission in original) (internal quotation marks omitted).  Here, Goins testified repeatedly

that the context and content of his complaints made their nature clear.  *See, e.g.*, Trial Tr. 38,

June 29, 2010 ("I complained to the lieutenant.  I mean, I made it well known.  I might not have

said to my race [sic] but, believe me, . . . it was clear in what I was saying.").  The jury could

have credited this testimony and concluded that Wilkins was aware of the nature of Goins's

complaints.[2]  Moreover, it is undisputed that Goins joined the other four plaintiffs in submitting

the August 24 written complaint to the D.C. Office of Human Rights and the U.S. Department of

Justice.  *See* Pls.' Opp'n Ex. 29 (August 24, 2006 written complaint) at 8.  And it is clear that the

---

[2]        The District also contends that "Goins made no showing at trial that his [oral] complaints pre-dated . . . [the] decision to reorganize the Focus Mission Unit."  Def.'s Mem. at 18.  This is simply incorrect; Goins testified that he had already complained to Wilkins before the other plaintiffs submitted the anonymous letter on June 16; the FMU was not reorganized until after that date.  *See* Trial Tr. 114, June 28, 2010.

August 24 complaint was protected by Title VII.[3]  Accordingly, the jury's conclusion that Goins, like the other plaintiffs, engaged in protected activity is supported by the record.[4]

### 2.    Materially Adverse Action

The second element of a Title VII retaliation claim is materially adverse action.  A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation mark omitted).  This standard requires the Court, or a juror, to ask "whether the objective 'reasonable worker' would have been dissuaded from making [or supporting] a discrimination complaint." *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 n.5 (D.C. Cir. 2008) (quoting *Burlington N.*, 548 U.S. at 68).  Whether any given act would have that effect "will often depend upon the particular circumstances.  Context matters." *Burlington N.*, 548 U.S. at 69.  For that reason, the Court will consider the reorganization of the FMU (and the denial of Caudle's, James's, Smalls's, and Goins's applications) separately from the denial of Miller's transfer request.

### a.    FMU Reorganization

Plaintiffs contend that each of the three steps in the FMU reorganization constituted a separate materially adverse action: the reapplication requirement, the denial of plaintiffs'

---

[3]       As with the June 16 letter, the District argues that MPD officials were unaware of the August 24 complaint.  But, as explained above, that fact goes to whether a causal connection exists between the complaint and any adverse action, not whether the complaint was protected.

[4]       Plaintiffs' September and October EEOC complaints were also clearly protected, but, as the District points out, those activities could not have caused any of the materially adverse actions that preceded them.

applications, and plaintiffs' subsequent transfers to the patrol and intelligence units.  Whether

that is true, however, the Court need not determine; a reasonable jury, considering all of these

steps together, could have concluded that each plaintiff experienced materially adverse action.

There is ample support in the trial record for the proposition that the FMU was a

exceptional, desirable assignment that provided professional opportunities not otherwise

available to First District MPD officers.  Captain Ralph McLean, who had supervisory authority

over the First District FMU, testified that "productive" patrol officers might earn a position with

the FMU, where they would generally have more chances to make arrests and go to court than

were available in patrol.  Trial Tr. 169–70, June 15, 2010.  Further, officers had more

opportunities in the FMU to earn overtime pay than they did in either patrol or the Intel unit.

Trial Tr. 20–21, June 29, 2010.  For these reasons, among others, patrol officers aspired to FMU

positions.  *See, e.g.*, Trial Tr. 8–9, June 30, 2010.  Consequently, Caudle, who was removed from

the FMU and returned to a patrol position, experienced diminished responsibility, professional

opportunities, prestige, and job satisfaction.  These changes are sufficient to allow a reasonable

juror to conclude that he experienced materially adverse action.  *See Forkkio v. Powell*, 306 F.3d

1127, 1131 (D.C. Cir. 2002) ("'[R]eassignment with significantly different responsibilities . . .'

generally indicates an adverse action." (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742

(1998))); *cf. Medina v. District of Columbia*, 517 F. Supp. 2d 272, 289 (D.D.C. 2007) (holding

that "[d]enying an [MPD officer] a transfer back into a specialized division like [the Office of

Internal Affairs] in which he has expertise might well dissuade a reasonable employee from

making or supporting his charge of discrimination").[5]

The same is true as to James, Smalls, and Goins, who were assigned to the newly created

Intel unit (of which they were the only members).  Trial Tr. 143–44, June 30, 2010.  The Intel

unit lacked a defined portfolio and was arguably redundant with MPD's central Intelligence

Division.  Trial Tr. 80–81, June 15, 2010 (test. of William James) (describing the MPD's

"citywide Intel" division); Trial Tr. 115, June 22, 2010 (test. of Diane Groomes) (acknowledging

that the Intel unit had "no written plan or definition"); Trial Tr. 32, 34, June 28, 2010 (test. of

Cmdr. David Kamperin) (acknowledging the concern that the Intel unit "was a duplication of

services").  Unlike their FMU counterparts, the Intel officers did not enjoy access to their own

department vehicle, and spent the majority of their time at their desks.  Trial Tr. 82, June 15,

2010; Trial Tr. 118, June 22, 2010.  The Intel officers did not participate in the field activities

(observation posts, arrest teams, etc.) that were common during FMU duty.  Trial Tr. 85, June 15,

2010.  And they had fewer opportunities to earn overtime pay.  Trial Tr. 85, June 15, 2010; *see

Mentzer v. Lanier*, 677 F. Supp. 2d 242, 252 (D.D.C. 2010) (holding that a police officer's loss

of "opportunities for overtime" can contribute to a finding of material adversity).  The jury thus

had ample reason to conclude that James, Smalls, and Goins had "significantly diminished

---

[5]    The District makes two responses as to Caudle, neither of which is persuasive.
First, it contends that Caudle's transfer to patrol caused no "diminution in [his] title, salary, rank,
or grade," or any similar consequence for the terms or conditions of his employment.  Def.'s
Mem. at 23.  But this argument relies on the adverse-action standard that governs Title VII
discrimination claims, which is stricter than the *Burlington Northern* standard used in retaliation
cases.  *See Baloch*, 550 F.3d at 1198 n.4.  Second, the District argues that, because Caudle was
"detailed" to the FMU rather than permanently assigned there, "simply requiring him to
apply/compete to remain . . . is not a materially adverse action because no permanency in the
Unit was ever guaranteed."  Def.'s Mem. at 23.  Even if accurate, however, this contention
simply has nothing to do with whether a reasonable employee in Caudle's position would have
been deterred from pursuing a charge of discrimination.

responsibilities," *Czekalski v. Peters,* 475 F.3d 360, 365 (D.C. Cir. 2007), after their transfer to

the Intel unit.  Accordingly, even if that transfer formally constituted a "lateral" reassignment, the

jury still had a sufficient basis to conclude that the transfer was materially adverse.  *See id.* at 364

(noting that lateral transfers can constitute adverse action); *Stewart v. Ashcroft*, 352 F.3d 422,

426 (D.C. Cir. 2003) (same).[6]

In sum, the cumulative effect of the FMU reorganization was to remove Caudle, James,

Smalls, and Goins from an elite unit in which they thrived and place them in positions with less

responsibility and fewer opportunities for compensation and advancement.  On this record, the

jury's determination that plaintiffs experienced materially adverse action was eminently

reasonable.  *See Forkkio*, 306 F.3d at 1131; *see also Czekalski,* 475 F.3d at 365 ("Whether a

particular reassignment of duties constitutes an adverse action for purposes of Title VII is

generally a jury question.  The court may not take that question away from the jury if a

reasonable juror could find that the reassignment left the plaintiff with significantly diminished

responsibilities." (citing *Burlington N*., 548 U.S. at 71; *Holcomb v. Powell*, 433 F.3d 889, 902

(D.C. Cir. 2006)) (internal citation omitted)).

### b.    The Denial of Miller's Transfer Request

As described above, Miller did not apply to remain in the FMU.  During her time in the

unit, Miller worked an evening shift that lasted from 2:30 p.m. to 11:00 p.m.  Trial Tr. 41, June

---

[6]    The District also contends that Caudle and James could not have experienced materially adverse action as a result of their transfers because they had previously applied to leave the FMU.  The District presumably means that a reasonable worker would not be deterred from opposing discrimination by being removed from a unit she had already asked to leave.  But whether or not Caudle and James had *previously* desired to leave the FMU, it was clear that they intended to stay when the unit was reorganized, because they applied to keep their positions. *See* Trial Tr. 50, June 15, 2010; Trial Tr. 34, June 30, 2010.

21, 2010.  In early 2006, however, she decided that she needed to be home in the evenings to care for her daughter.  She asked Wilkins to transfer her to the day shift in the FMU, but he refused. In May, Miller asked Groomes if she could transfer to patrol and take a day shift there.  Trial Tr. 45, June 21, 2010; *see also* Trial Tr. 85, June 24, 2010.  Groomes responded that the transfer would be "no problem" and asked Miller to put her request in writing.  Trial Tr. 46, June 21, 2010.  Miller submitted her written request in July.  Trial Tr. 72, June 21, 2010.  In August, Groomes denied the request.  Trial Tr. 74, June 21, 2010.  Miller was thus transferred to patrol, but given an evening shift, which prevented her from being home with her daughter after school. Trial Tr. 81, June 21, 2010.

The dispositive question here is thus whether the denial of a requested schedule change can constitute materially adverse action.  And that question was effectively answered in *Burlington Northern*: in emphasizing that context is essential to a material-adversity determination, the Supreme Court observed that a "change in an employee's work schedule may make little difference to many workers, but *may matter enormously to a young mother with school-age children.*"  *Burlington N.*, 548 U.S. at 69 (emphasis added).  Here, there was ample evidence that Groomes's decision not to change Miller's shift, which prevented Miller from being at home with her school-age daughter (who had been having trouble in class and with her homework) "matter[ed] enormously" to Miller.  *See* Trial Tr. 76–77, June 21, 2010 ("[I]t meant everything to me to be able to get my daughter in the evenings, help her with her homework, and get her to bed at night."); *see also* Trial Tr. 41, 81, June 21, 2010.  A reasonable employee in Miller's shoes could easily have been dissuaded from pursuing a charge of discrimination if she knew that doing so would prevent her from spending important time with her child.

13

Accordingly, the jury's conclusion that Miller experienced materially adverse action was reasonable and supported by the evidence.[7]

###    3.    Causal Connection

The final element of a Title VII retaliation claim is a causal connection between the first two elements; a plaintiff must connect the adverse action she experienced to her protected activity. *See Wiley*, 511 F.3d at 155; *Stewart*, 275 F.3d at 1134. A plaintiff can establish this connection in multiple ways, including by showing that the employer's explanation for the adverse action is "unworthy of credence," *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (internal quotation mark omitted); by establishing very close temporal proximity between the protected activity and the adverse action, *see id.*; or by pointing to a "pattern of antagonism" on the part of the employer, *id.* at 1323 (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997)). These various approaches are not exclusive, either mutually or absolutely; "the proffered evidence, looked at as a whole, may suffice to raise the inference" of causality. *Buggs v. Powell*, 293 F. Supp. 2d 135, 149 (D.D.C. 2003) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173 (3d Cir. 1997)) (internal quotation mark omitted); *see also Sharma v. District of Columbia*, 2011 WL 2418917, at *10 (D.D.C. June 17, 2011) (explaining that the D.C. Circuit has "often . . . evaluated causation based on the totality of a plaintiff's allegations"). At the outset, however, the plaintiff must show that the employer "had knowledge of her protected activity." *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011). The Court first addresses that issue.

---

[7]    The fact, emphasized by the District, that Miller apparently never told Groomes *why* she wanted the transfer is simply irrelevant to whether Groomes's denial of the request meets the material-adversity standard.

### a.      Employer Knowledge of Protected Activity

As noted above, the District argues that plaintiffs cannot establish a causal connection

between the June 16 letter and the adverse actions they experienced because the letter was

unsigned; thus, the District contends, Groomes did not know who wrote it and could not have

retaliated against plaintiffs for doing so.  Def.'s Mem. at 13.  The District emphasizes that

Groomes never admitted to knowing who wrote the June 16 letter, and that the email she

received from Howard merely expressed Howard's "belief" that Caudle, James, Smalls, and

Miller were responsible for it.  But plaintiffs need not produce conclusive, direct evidence that

Groomes knew that plaintiffs were behind the letter; they "need only offer circumstantial

evidence that could reasonably support an inference that [she] did." *Jones v. Bernanke*, 557 F.3d

670, 679 (D.C. Cir. 2009); *accord Talavera*, 638 F.3d at 313.  Howard's email — along with

testimony of an apparently open and unanimous belief among FMU personnel that plaintiffs were

responsible for the letter — is sufficient to support such an inference.  *See* Trial Tr. 54, June 21,

2010; Trial Tr. 195–96, June 24, 2010; Trial Tr. 19, 28, June 28, 2010.

Likewise, the Court is unpersuaded by the District's similar argument that plaintiffs failed

to show at trial that any MPD officials were aware of the August 24 complaint that plaintiffs sent

to the D.C. Office of Human Rights and the U.S. Department of Justice.  *See* Pls.' Opp'n Ex. 29

(Aug. 24, 2006 written complaint).  The District points out that, although the August 24

complaint was not anonymous, it was not sent to Groomes, Wilkins, or any other First District

MPD officials.  In addition, neither Groomes nor Wilkins admitted to having any knowledge of

it.  But, as plaintiffs observe, Groomes testified that she had read in a letter that members of the

FMU were being excluded from certain operations.  Trial Tr. 94, June 23, 2010.  And, although

15

Groomes attributed that information to the June 16 letter, the June 16 letter made no reference to such exclusions; rather, that information appeared only in the August 24 complaint. *Compare* Pls.' Opp'n Ex. 20 (unsigned letter to Diane Groomes, June 16, 2006), *with* Pls.' Opp'n Ex. 29 (Aug. 24, 2006 written complaint).  Moreover, Howard — who had previously told Groomes that she believed plaintiffs were behind the June 16 letter — was aware of plaintiffs' second complaint (and that Goins was involved in it).  Trial Tr. 21, June 21, 2010.  The jury could reasonably have inferred from Groomes's and Howard's testimony that Groomes learned of the August 24 complaint or its substance.[8]

Accordingly, the Court concludes that the jury had a sufficient evidentiary basis from which to infer employer knowledge of plaintiffs' protected activity.  Employer knowledge, however, is a necessary but not sufficient condition to establish a causal connection; thus, the Court turns to the ultimate question of causation.  As above, the Court will consider the denial of Miller's requested transfer separately from the reorganization of the FMU.

### b.        The Reorganization of the FMU

### i.        Evidence of Pretext

Where, as here, an employer has offered a facially legitimate reason for an allegedly retaliatory action, the plaintiff's ability to establish a causal connection will often depend on whether she can show that the employer's proffered explanation is "unworthy of credence." *Taylor*, 571 F.3d at 1322 (quoting *Burdine*, 450 U.S. at 256) (internal quotation mark omitted).

---

[8]        There is no merit to the District's repeated assertions that plaintiffs not only failed to show that Groomes knew of their protected activity, but also failed to establish a motive for her alleged retaliation. *See, e.g.*, Def.'s Mem. at 15, 25.  There is no requirement that a Title VII retaliation plaintiff make such a showing. *See Wiley*, 511 F.3d at 155; *Stewart*, 275 F.3d at 1134.

This is so because a "jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be [retaliatory] intent." *Colbert v. Tapella*, 2011 WL 2417131, at *2 (D.C. Cir. June 17, 2011) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) (en banc)) (internal quotation mark omitted).[9]  A plaintiff must do more, however, than simply show that the employer's explanation is unfair or illogical; she must show that the proffered reason is not the real reason for the challenged action.  *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1248 (D.C. Cir. 2011) (citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

Here, the District contends that plaintiffs have failed to rebut its facially legitimate reason for reorganizing the FMU: that, in the summer of 2006, the unit "lacked cohesion."  Def.'s Reply to Pls.' Opp'n ("Def.'s Reply") at 7–8.  For example, Wilkins testified at trial that "tension [within the FMU] was one of the reasons why [the MPD] did the whole reapplication."  Trial Tr. 34, June 24, 2010.  But the District and its witnesses did not always explain the FMU's reorganization this way.  In its position statement to the D.C. Office of Human Rights (which was admitted at trial), the MPD explained that the FMU's reorganization was prompted by Executive Assistant Chief Fitzgerald, who told Groomes that the FMU's performance was low compared to that of other specialized units and that officers were spending too long in the FMU, which was originally envisioned as a one-to-two-year assignment.  Pls.' Opp'n Ex. 41 (MPD

---

[9]     The District is thus wrong to assert that plaintiffs must show not only that the District's proffered explanation for its actions is pretextual, but also that "the real reason for the action was unlawful [retaliation]."  Def.'s Reply at 7 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).  The D.C. Circuit recently reaffirmed that it has rejected that reading of *Hicks.  See Colbert*, 2011 WL 2417131, at *2 (citing *Aka*, 156 F.3d at 1290).

position statement) at 2–3.[10]  Likewise, Groomes testified at trial that the reorganization was

prompted by performance concerns; she denied, however, that replacing officers who had been

with the unit for too long was a goal of the reorganization.  Trial Tr. 25, 41–42, 47, June 22,

2010.[11]  These shifting justifications for the decision to reorganize the FMU are suggestive of

pretext.  *See Geleta v. Gray*, 2011 WL 2417142, at *5 (D.C. Cir. June 17, 2011); *see also*

*Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company,

at different times, gives different and arguably inconsistent explanations, a jury may infer that the

articulated reasons are pretextual.").

        One common strand, however, does run through the MPD's position statement and the

testimony of both Groomes and Wilkins: that the FMU was not performing well prior to the

reorganization.  *See* Pls.' Opp'n Ex. 41 (MPD position statement) at 3; Trial Tr. 25, June 22,

2010; Trial Tr. 34, June 24, 2010.  But the jury had further reason to doubt that this explanation

was genuine.  The sergeants who supervised the FMU officers on a daily basis testified that the

unit was performing well prior to the reorganization, Trial Tr. 31–32, June 28, 2010 (test. of Sgt.

Valerie Stewart), and that they saw no need for staffing changes.  Trial Tr. 201, June 24, 2010

(test. of Sgt. Gregory Wilson); *see also* Trial Tr. 114–15, June 29, 2010 (test. of Sgt. Dennis

Hance) (stating that Hance had no specific concerns about performance, and "thought everybody

was getting along pretty good").  Likewise, Captain McLean, who was positioned between

---

        [10]     The position statement does not expressly say whether Fitzgerald ordered
Groomes to reorganize the FMU or merely expressed his "displeasure" about the unit's
performance and the tenure of its members.  Pls.' Opp'n Ex. 41 (MPD position statement) at 3.

        [11]     Further, several of the officers who were allowed to remain in the FMU after the
reapplication process had already been members for several years.  Trial Tr. 47–50, June 22,
2010.

Groomes and Wilkins, saw no productivity problems with the FMU and never heard Groomes express any concerns of her own prior to his departure from the First District in July.  *See* Trial Tr. at 175–77, June 15, 2010.  Alone, this discrepancy is not dispositive; a disagreement among supervisors as to an employee's performance does not automatically render a performance-based justification pretextual.  *See, e.g.*, *Johnson v. Williams*, 117 F. App'x 769, 772 (D.C. Cir. 2004).  But, in combination with the inconsistencies described above (and the discrepancies in the testimony regarding the FMU selection process, described below), this disagreement between the FMU's direct supervisors and the First District higher-ups can contribute to a finding of pretext.  *Cf. McBride v. Seidman*, 1989 WL 39396, at *9, 11 (D.D.C. Apr. 7, 1989) (finding that the plaintiff's age discrimination claim was bolstered by the fact that he had been fired by a regional director who had ignored the relatively positive performance evaluations and personal opinions of the plaintiff's direct supervisors).[12]

Further problems arise when the Court turns to the District's explanations for denying the individual plaintiffs' applications to remain in the FMU.  Wilkins testified that he made a list of selectees for the FMU vice division with the help of Sergeants Wilson and Steward.  Trial Tr. 47–48, June 24, 2010.  According to Wilkins, Smalls was rejected because he lacked initiative and had performance issues, James was rejected because he lacked initiative and was a "follower," and Caudle was rejected because of his poor performance.  Trial Tr. 53, 59, June 24, 2010; *see also* Pls.' Opp'n Ex. 41 (MPD position statement) at 3 (stating that Wilkins identified

---

[12]     The Court cannot, however, accept plaintiffs' contention that the decrease in the FMU's performance statistics after the reorganization is strong evidence of pretext.  *See* Pls.' Opp'n at 33.  That the FMU's performance suffered may show that the reorganization was ill-considered, but it does not establish that the reorganization was not genuinely *intended* to address performance issues.  *See Fischbach*, 86 F.3d at 1183.

Smalls and James as "low producers" who should be reassigned).  Wilkins also testified that

Wilson and Steward concurred in the decisions to remove these officers from the FMU for these

reasons.  Trial Tr. 52–53, 59, June 24, 2010.  But Wilson testified that Wilkins never asked him

about whether any current FMU officers should remain, and that he had "no input on who would

be leaving" the FMU.  Trial Tr. 201–03, June 24, 2010.  Likewise, Steward testified that Wilkins

did not ask her who should stay, and that she made no recommendations as to which officers

should be selected to join or remain in the FMU.  Trial Tr. 34–35, June 28, 2010.  As to the

specific candidates, Wilson described Smalls as "very knowledgeable," "a good officer," and

"kind of a leader," and stated that she had no concerns about his performance.  Trial Tr. 208–09,

June 24, 2010.  Likewise, Steward testified that she saw no reason for and "didn't understand"

James's removal from the FMU.  Trial Tr. 38, June 28, 2010.  And Groomes herself testified that

James and Smalls were not, in fact, "low producers," but rather had "strong performance";

consequently, she "handpicked" them (along with Goins) to join the new Intel unit.  Trial Tr.

110–11, June 22, 2010.[13]

Thus, Wilkins's testimony that he recommended candidates to be removed from the FMU

based on their poor performance, after consulting with the sergeants who supervised the officers

directly, was flatly contradicted by the testimony of the sergeants (who disagreed both with

Wilkins's performance assessments and his description of the selection process) and of Groomes

---

[13]     Similarly, Wilkins claimed that he relied on the recommendations of Sergeant
Hance to select candidates for the FMU's auto theft division, Trial Tr. 48, June 24, 2010, but
Hance testified that he was "left out of that decision-making process" and did not find out about
the reapplications until sometime in early 2007.  Trial Tr. 119–20, June 29, 2010.  And Wilkins
asserted that he had always had a problem with Caudle's performance, Trial Tr. 59, June 24,
2010, but admitted to signing off on Caudle's strong performance evaluations.  Trial Tr. 6, June
24, 2010.

herself (who explained that she "handpicked" James, Smalls, and Goins for the Intel unit because

of their "strong performance").  As above, these inconsistent explanations for the challenged

employment decisions are probative of pretext.  *See Geleta*, 2011 WL 2417142, at *5;

*Domínguez-Cruz*, 202 F.3d at 432.  Indeed, the jury could reasonably have inferred from the

contradictions between Wilkins's description of the selection process and the testimony of the

supervising sergeants that Wilkins was dissembling to conceal the true motive behind his

recommendations to Groomes.  *See Aka*, 156 F.3d at 1293 ("If the jury can infer that the

employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should

provide even stronger evidence of discrimination.").[14]

Finally, the jury could have reasonably doubted that the individual plaintiffs were

removed from the FMU for performance reasons because many of the officers whose

applications were accepted were less experienced and had lower performance ratings than did

plaintiffs.  *See, e.g.*, Trial Tr. 62, June 24, 2010 (half of the accepted officers had lower

performance ratings than Caudle).[15]  Indeed, Caudle had been named FMU Officer of the Year.

Trial Tr. 13, June 30, 2010.[16]  Given the absence of a clear correlation between those officers

---

[14]    Likewise, the jury could have concluded from this testimony that the District had "misstate[d] the candidates' qualifications" to remain in the FMU, which can support a finding of pretext.  *See Aka*, 156 F.3d at 1295.

[15]    If a desire to remove long-tenured officers was a real goal of the reorganization, then the fact that plaintiffs were replaced by less experienced officers would not be noteworthy; but Groomes, who made the actual decisions as to which applications to accept, denied that doing so was a goal of the reorganization process.  *See* Trial Tr. 41–42, 47, June 22, 2010.

[16]    The District asserts that Caudle was removed, notwithstanding his strong record, because he had failed to "back up" other FMU officers.  But the testimony that Caudle failed to support other officers came from Steward, *see* Trial Tr. 61, June 28, 2010, who nevertheless rated Caudle's performance during the time in question as exceeding expectations, *see* Pls.

selected for the FMU and either longevity of experience or prior performance assessments, the jury had further reason to be skeptical of the District's explanations.[17]

In sum, the jury, considering all of the foregoing together, could have concluded that the District's proffered explanations for the FMU's reorganization (and the decisions made on plaintiffs' individual applications) were simply not credible. Such a conclusion will almost always justify an inference of unlawful intent. *See Colbert*, 2011 WL 2417131, at *2 (a jury can infer unlawful intent from a false explanation, unless there is only a weak issue of fact as to the explanation's falsity or conclusive evidence of some other, nondiscriminatory reason for the decision (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)); *see also Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999) ("The question is whether the plaintiffs have cast such doubt on [the defendant's rationale's] credibility that a reasonable juror could regard it as pretext and infer a discriminatory motive . . . ."). Here, however, plaintiffs also produced other evidence supporting an inference of retaliatory intent.

---

Opp'n Ex. 42 (MPD Officer Performance Rating Form, Oct. 1, 2004–Sept. 30, 2005), and who claimed that she reported Caudle's failure to back up other officers to Wilkins at a time when Wilkins was not even the FMU's lieutenant yet. *See* Trial Tr. 7, June 24, 2010; Trial Tr. 103, June 28, 2010. In light of these contradictions, the jury could have discounted this testimony — and even inferred pretext. *See EEOC v. D.C. Public Schs.*, 277 F. Supp. 2d 44, 51 (D.D.C. 2003) (finding a genuine issue of material fact as to discriminatory intent where an employer's stated, performance-based reasons for laying off the plaintiff were not reflected in the plaintiff's performance evaluations).

[17]     That Officer Philpotts was allowed to remain in the FMU despite signing plaintiffs' August 24 complaint does little to advance the District's arguments; as plaintiffs point out, he was due to be promoted soon, and was thus going to leave the FMU anyway. Trial Tr. 7, June 29, 2010.

ii.      **Other Evidence of Causation**

As noted above, a plaintiff seeking to establish a causal connection between her protected activity and an adverse action is not limited to calling the employer's explanation for that action into question.  Close temporal proximity between the protected activity and the adverse action, *see Taylor*, 571 F.3d at 1322, or a pattern of antagonism on the part of the employer, *id.* at 1323, can also help establish causation.

Here, plaintiffs testified that, at and after the unit-wide meeting at which Groomes discussed their complaint, they were subjected to ridicule, isolation, and exclusion by the officers and other members of the FMU.  *See, e.g.*, Trial Tr. 30–32, 129–31, June 30, 2010.  Smalls characterized the meeting as "a potshot meeting where everybody was taking shots at us."  Trial Tr. 130, June 30, 2010; *see also* Trial Tr. 41–42, June 15, 2010.  Soon thereafter, plaintiffs, who had previously ridden together in one car while on patrol, were "split up and put into different cars," which no other FMU officers experienced.  Trial Tr. 32–33, 131, June 30, 2010; *see also* Trial Tr. 44–45, June 15, 2010.  And plaintiffs (and no other officers) were for the first time excluded from executions of search warrants by the FMU.  Trial Tr. 44, June 15, 2010; Trial Tr. 131–33, June 30, 2010.  Further, as James testified, plaintiffs were for the first time denied leave, excluded from briefings on dangerous suspects entering their jurisdiction, and denied information about observation posts and narcotics operations.  Trial Tr. 42–44, June 15, 2010; *see also* Trial Tr. 66–67, June 21, 2010; Trial Tr. 31–32, June 30, 2010.

The jury, crediting this testimony, could easily have concluded that, between the time of their first complaint and the reorganization of the FMU, plaintiffs experienced a "pattern of antagonism" on the part of the FMU's officers and members.  This pattern, coupled with the

timing of plaintiffs' complaints and the adverse actions described above, and considered along with the District's shifting and inconsistent explanations for those actions, supports an inference of causation. *See Buggs*, 293 F. Supp. 2d at 149 (noting that "the proffered evidence, *looked at as a whole*, may suffice to raise the inference" of causality (emphasis added)); *Sharma*, 2011 WL 2418917, at *10 (same). Accordingly, the District's motion for judgment as a matter of law must be denied as to Caudle, James, Smalls, and Goins.

### c.       The Denial of Miller's Transfer

The District contends that plaintiffs introduced no evidence at trial linking Miller's participation in plaintiffs' written complaints to the denial of her request to transfer to the patrol day shift. Plaintiffs respond that Groomes's unexplained retraction of her agreement to transfer Miller, along with the timing of that decision and the fact that there was a vacancy in the patrol day shift, supported the jury's verdict. Plaintiffs have the stronger argument.

As Miller testified at trial, she asked Groomes in May 2006 if she could transfer to the patrol day shift. Trial Tr. 45, June 21, 2010. Groomes responded that a transfer would be "no problem" and asked Miller to put her request in writing, which Miller did in July. Trial Tr. 46, 72, June 21, 2010. In August — after the June 16 anonymous letter and after Howard's email to Groomes suggesting that Miller was involved — Groomes denied the request. Trial Tr. 74, June 21, 2010; Trial Tr. 121, June 22, 2010.

The District has offered no explanation for this reversal. *See* Def.'s Mem. at 16–17. Rather, the District argues that Miller's testimony regarding the May conversation in which Groomes agreed to the transfer "is insufficient to establish the existence of any promise," because Groomes herself does not remember the conversation. Def.'s Reply at 10. This is

simply incorrect.  If the jury credited Miller's testimony — which the Court must assume to be the case at this stage, *see Hayman v. Nat'l Acad. of Scis.*, 23 F.3d 535, 537 (D.C. Cir. 1994) — it could have concluded that Groomes agreed to the transfer.  Moreover, the timing of Groomes's still-unexplained reversal supports an inference of retaliation; after Miller submitted her written request on July 27, Groomes did not respond until August 11, and Wilkins did not notify Miller of the denial until August 23, after the deadline for FMU officers to apply to keep their positions.  This delay prevented Miller from applying to remain in the FMU with her current shift, which she would have preferred to an evening-shift patrol position.  Trial Tr. 75, June 21, 2010.

Moreover, there was evidence from which the jury could have concluded that there was a vacant day-shift patrol position at the time of Miller's request.  Although Groomes testified that no vacancy existed, Trial Tr. 125, June 22, 2010, plaintiffs introduced a First District schedule for the two-week period starting on July 23, 2006 (four days prior to Miller's request) that appeared to show a vacant day-shift patrol position.  *See* Pls.' Opp'n Ex. 43 (MPD Roll Call Sheet, July 23, 2006).  Further, plaintiffs established through Groomes's own testimony that, while Miller's request was pending, officers junior to her held day-shift patrol positions and that, after Miller's request was denied, at least one other officer was added to the day-shift patrol schedule.  Trial Tr. 133, June 22, 2010.  The jury, considering all of this evidence — and especially Groomes's apparently unexplained reversal — could reasonably have concluded that Miller's transfer request was denied because of her participation in protected activity.  *See Lathram v. Snow*, 336 F.3d 1085, 1094 (D.C. Cir. 2003) ("[A]n unexplained inconsistency [in an employer's decision-making process] can justify an inference of discriminatory motive.").  Accordingly, the District's motion for judgment as a matter of law must be denied as to Miller.

**B.      New Trial**

The District next contends that it is entitled to a new trial "because the verdict was tainted by the improper admission of evidence, improper argument made by Plaintiffs' counsel, and the submission of erroneous legal theories to the jury."  Def.'s Mem. at 29.  The District identifies a raft of supposed errors that ostensibly rendered the trial unfair.  The Court will consider each in turn.

**1.      Admission of Dr. Lanier's Tables**

First, the District contends that the Court erred by admitting charts produced by Dr. Louis Lanier, plaintiffs' expert economist, which quantified the overtime opportunities that plaintiffs lost as a result of their reassignments.  *See* Pls.' Opp'n Ex. 44 (Pls.' Trial Ex. 11A, overtime summary tables).  The District contends that this admission was error because the charts were irrelevant to the appropriate amount of compensatory damages, and effectively allowed the plaintiffs to ask for a specific dollar amount in damages (contrary to the Court's instructions).  Plaintiffs respond that the charts were relevant to the issue of material adversity and that the Court negated any risk that the jurors would base their damage awards on the charts by instructing them not to consider or award back-pay damages.  Plaintiffs have the stronger position.

As noted above, a loss of opportunities to earn, or a reduction in, overtime pay can contribute to a finding of material adversity.  *See Mentzer*, 677 F. Supp. 2d at 252; *supra* section III.A.2.a.  Accordingly, the extent to which plaintiffs' transfers reduced their ability to earn overtime pay is relevant to whether plaintiffs experienced materially adverse action, and the District's argument that the charts should have been excluded as irrelevant is incorrect.

26

Likewise, the Court cannot agree that the charts effectively allowed plaintiffs to request a specific dollar figure in damages; as plaintiffs point out, the Court expressly instructed the jury that it "should not consider any damages for any backpay that a plaintiff may have lost or compensation for employment that a plaintiff might lose in the future. Those items of damages are not within your province as the jury, but are [the Court's] responsibility." Trial Tr. 21, July 7, 2010. The Court sees no basis to conclude that the jury flouted this clear instruction.

In its reply brief, the District offers another objection to Lanier's charts: that, because they were based on a flawed methodology that conflicted with the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and the District's municipal regulations, the charts overcounted plaintiffs' overtime hours. Thus, the District argues, the Court should have excluded the charts or at least allowed the District to explore Lanier's methodology on cross-examination. But, as plaintiffs point out, Lanier's overtime determinations were based solely on the data provided by the MPD, which identified hours worked as regular, overtime, or court-overtime. *See* Pls.' Surreply Ex. 1 (sample pay data); Trial Tr. 165, June 29, 2010 ("Q: Did you exercise any discretion regarding what was an overtime hour and what was not an overtime hour? A: No. I made no determination of that. The data that were already provided had the overtime hours already marked."). Thus, the District's data, rather than Lanier's methodology, were responsible for any errors in his overtime tabulations, and any exploration thereof on cross-examination would not have aided the District in clarifying this issue. And, more importantly, given the charts' minimal role in establishing material adversity — as discussed above, there was ample reason for the jury to find that plaintiffs' transfers constituted materially adverse action — the Court cannot conclude that the alleged errors in the charts resulted in anything more than a "minor evidentiary

27

error[].″  *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d at 87.

### 2.    "Golden Rule" Violations

The District next asserts that plaintiffs' counsel made three impermissible "golden rule"

arguments — that is, arguments that asked the jurors to imagine themselves in plaintiffs' shoes

— and that the Court's inadequate response to these arguments biased the jurors, causing them to

"lash out at the District."  Def.'s Mem. at 34–35.  Plaintiffs rejoin that no golden rule violations

occurred, but that, even if they did, they were rendered harmless by the Court's sustaining the

District's objections and issuing curative jury instructions.  Pls.' Opp'n at 44.  Plaintiffs are

correct.

During her closing argument, plaintiffs' counsel made three comments that the District

contends were improper golden rule arguments.  Plaintiffs vigorously dispute the District's

characterization.  They argue that two of counsel's statements[18] were actually intended to aid the

jurors in applying the material-adversity standard articulated in *Burlington Northern*, which

requires the factfinder to ask whether the defendant's conduct would dissuade "a reasonable

person *in the plaintiff's position*" from pursuing a charge of discrimination.  *See Burlington N.*,

---

[18]    Counsel's first two comments, both of which were truncated by objections, went as follows:

> PLAINTIFFS' COUNSEL: You heard plaintiffs explain that they felt humiliated, berated, and isolated at the meeting listening to their supervisors and peers comment on their discrimination complaint.  Now, ask yourself, would you hesitate to speak up if you knew that speaking up would mean that your boss would call a meeting with your entire office —
> . . .
> PLAINTIFFS' COUNSEL: Officer Chaplin likewise testified he was worried about the reapplication because he wanted to stay in the FMU. Ask yourself this: Wouldn't you think twice about complaining about workplace discrimination —

Trial Tr. 11, 12, July 6, 2010.

548 U.S. at 71 (emphasis added).  And, plaintiffs contend, the third comment[19] was intended only to communicate the gravity of plaintiffs' injuries, not to appeal to the jury's emotions.  These arguments are not without force; regardless, the Court need not decide whether counsel's comments were actually golden rule arguments because, even if they were, no prejudice could possibly have resulted.  *See Ins. Co. of N. Am. v. U.S. Gypsum Co.*, 870 F.2d 148, 154 (4th Cir. 1989) ("The law is clear that although it is improper to ask jurors to place themselves in the position of a party, such a 'golden rule' argument does not constitute reversible error if no prejudice arise[s] from counsel's comment.").[20]

In all three instances, the District objected before plaintiffs' counsel finished the offending sentence, and in all three instances the Court sustained the District's objection.  Trial Tr. 11, 12, 50, July 6, 2010.  After the third comment, the Court noted that plaintiffs' counsel had made an improper golden rule argument and instructed the jury to disregard it.  Trial Tr. 50–51, July 6, 2010.  Finally, in the general jury instructions, the Court directed the jurors to "decide the facts of this case only from a fair evaluation of all of the evidence without prejudice, sympathy, fear, favor, or public opinion."  Trial Tr. 6, July 7, 2010.  Because the Court's specific instruction following the third comment, in combination with these general instructions, sufficed to cure any

---

[19]     Counsel's third comment, also cut short by an objection, was this:
PLAINTIFFS' COUNSEL: Now, in the end it is your job to determine how to make plaintiffs whole for what they have had to endure.  As you make those decisions, we ask yourselves to put yourselves in the plaintiffs' shoes.  What would it do to you to have your complaint broadcast to your entire office, to be the only one excluded —
Trial Tr. 50, July 6, 2010.

[20]     There is a circuit split (unimportant here because of the lack of prejudice) on whether golden rule arguments are impermissible at all times, or only as to the issue of damages.  *Compare, e.g.*, *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1071 n.3 (11th Cir. 1996), *with Edwards v. City of Philadelphia*, 860 F.2d 568, 574 n.6 (3d Cir. 1988).

minimal prejudice that might have arisen from counsel's comments, those comments do not

warrant a new trial.  *See United States v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989) (finding that,

although the prosecutor's golden rule comment was improper, it was not so prejudicial as to

deprive the defendant of a fair trial because the defense immediately objected to the comment,

the court sustained the objection, and the prosecutor rephrased the argument); *Edwards v. City of

Philadelphia*, 860 F.2d 568, 574 (3d Cir. 1988) ("[A] clear and complete jury instruction on the

elements of the claim asserted and on the allocation of the burdens of proof . . . is sufficient to

cure harm caused by a 'Golden Rule' argument."); *Loose v. Offshore Navigation, Inc.*, 670 F.2d

493, 497 (5th Cir. 1982) (noting that after a golden rule violation the "trial judge may, by

appropriate instruction, salve the suit").

### 3.    Reapplication Issues

Next, the District makes a number of interconnected arguments regarding whether

plaintiffs did in fact apply to remain in the FMU.  The first relates to the District's failure to

preserve the plaintiffs' application forms (with the exception of a fragment of Goins's form,

discussed below), known as "PD 681s."  In light of that failure, the Court instructed the jury (at

plaintiffs' request) that

> the defendant had an obligation to preserve the reapplications submitted by officers
> as part of [the FMU reapplication process]. . . . The defendant violated its duty to
> preserve these reapplications and instead allowed them to be lost or destroyed.  That,
> as a result, you can draw, but are not required to draw, all reasonable inferences
> against the defendant regarding the content of the missing reapplications.  That
> means that you can conclude, but are not required to conclude, that if the
> reapplications had been kept[,] the records would have supported a plaintiff's claim
> . . . .

Trial Tr. 14–15, July 7, 2010.  The District argues that this instruction was improper because the

District had no obligation to preserve the applications and did not intentionally destroy them, and because the applications were not necessary.  The District is incorrect.

An adverse-inference instruction of this sort is appropriate where (1) "the party having control over the evidence had an obligation to preserve it when it was destroyed or altered"; (2) "the destruction or loss was accompanied by a culpable state of mind"; and (3) a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.  *Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (quoting *Thompson v. HUD*, 219 F.R.D. 93, 1010 (D. Md. 2003)) (internal quotation marks omitted).

Here, the District, like any party, had an obligation to preserve evidence that it should have known might be relevant to future litigation, *id*., and plaintiffs' late-2006 written complaints and EEOC charges (which expressly challenged the FMU reapplication) put the District on notice of potential litigation regarding this matter.  Further, the District is incorrect that plaintiffs must show that the evidence was *deliberately* destroyed; in this context, a "culpable state of mind" encompasses mere negligence.  *Id*. at 292 (citing *More v. Snow*, 480 F. Supp. 2d 257, 275 (D.D.C. 2007)); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002).  And lastly, the applications would clearly have supported plaintiffs' claims here, both by showing that plaintiffs did in fact reapply for their positions and by aiding plaintiffs in comparing their credentials to those of the officers who were selected.  *See Lathram*, 336 F.3d at 1091–92 (comparison of credentials can be relevant to a finding of pretext).  Accordingly, the District is incorrect that the adverse-inference instruction was improper.

The District's next argument concerns Goins's application to remain in the FMU.  In its

responses to plaintiffs' pre-trial interrogatories, the District identified Goins as one of the officers

who reapplied to the FMU.  *See* Pls.' Opp'n Ex. 53 (District's amended responses to plaintiffs'

first set of interrogatories) at 8–11.  The District also admitted to producing Goins's application

(although only half of it) during discovery, *see* Pls.' Opp'n Ex. 47 (District's responses to

plaintiffs' second set of requests for admission) at 38, and did not object when plaintiffs listed

that document on their pre-trial exhibit list.  At trial, however, the District contended that Goins

had applied to the FMU but not to the auto theft division thereof, and challenged the authenticity

of the partial application form (which it had produced).  Accordingly, at plaintiffs' request, the

Court ruled that the District could not elicit testimony that Goins failed to apply to the auto theft

unit, and further that certain exhibits in which the District had made that assertion be redacted.

*See* Trial Tr. 3–4, June 24, 2010.

The District now challenges these rulings on the basis that its failure to produce Goins's

complete application form should not have prevented it from questioning him about his

application.  This position is without merit, for two reasons.  First, the District's argument

entirely overlooks the contradiction between the position it took at trial and its own averments

before the trial commenced; although the District contends that it was effectively ambushed by

the Court's rulings, it was in fact the District's sudden reversal that was potentially unfair.  *See*

*Ard v. Metro-N. R.R.*, 492 F. Supp. 2d 95, 104–05 (D. Conn. 2007) (holding that it was proper to

prevent the defendant from taking a position at trial that contradicted the position taken in its

discovery responses).  Second, as plaintiffs point out, it was the District's failure to preserve

Goins's entire application form that enabled the District to suggest that he had not applied to both

FMU components (and to question the authenticity of the fragmentary form itself).  Thus, the

Court's ruling preventing the District from eliciting certain testimony was a necessary remedy for the District's misconduct, as was the ruling that certain exhibits be redacted.[21]

### 4.     Verdict Form

Next, the District challenges the Court's approval of a verdict form that did not ask jurors whether the individual elements of a Title VII retaliation claim had been established, instead asking as to each plaintiff: "Do you find that defendant violated [the individual plaintiff's] rights under Title VII of the Civil Rights Act of 1964?"  *See* Verdict Forms [#283].  The District avers that a general verdict form of this type was inappropriate for use in this case because it allowed the jury to base liability on Wilkins's alleged racial discrimination rather than the District's alleged retaliatory acts.  The District further asserts that the absence of special interrogatories regarding some of the specific issues discussed above (such as the protected status of plaintiffs' August 24 letter, or the materially adverse nature of the District's actions) "rendered core elements of the Plaintiffs' case and the District's defense virtually meaningless."  Def.'s Mem. at 38.  These arguments are meritless.

It is well established that a verdict form should not be considered in isolation, but must instead be evaluated in conjunction with the jury instructions.  *See, e.g.*, *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 687 (D.C. Cir. 1996) (finding no error where, "[a]lthough the verdict form might have been clearer," "the district court correctly instructed the jury on the law"); *see also United States v. Riccio*, 529 F.3d 40, 47 (1st Cir. 2008) ("[W]e review the

---

[21]     The District somehow manages to argue both that it should have been allowed to argue that Goins did not timely submit an application form, and that no application form "was particularly probative of any fact at issue."  Def.'s Mem. at 36 n.9.  These contradictory positions do not advance the District's argument that the Court's adverse-inference and redaction rulings were erroneous.

[verdict] form as a whole, in conjunction with the jury instructions, in order to determine whether the issues were fairly presented to the jury."). Here, the jury instructions made clear that each plaintiff "must prove every element of his or her claim . . . by a preponderance of the evidence," and that "the case of each plaintiff is separate from and independent of that of any other plaintiff." Trial Tr. 7, July 7, 2010. The instructions also laid out the elements of a retaliation claim under Title VII and defined each element. *See* Trial Tr. at 15–19, July 7, 2010. And they expressly stated that "[e]ach plaintiff has only sued the defendant for retaliation and *not for race discrimination*. Therefore, the validity of each plaintiff's allegations of discrimination is not before you." Trial Tr. at 19, July 7, 2010 (emphasis added). The jury is presumed to have followed these instructions. *CSX Transp., Inc. v. Hensley*, —U.S.—, 129 S. Ct. 2139, 2141 (2009).

In light of these clear instructions — to which the District apparently has no objection — the District's arguments must fail. The jury instructions expressly foreclosed the possibility that the jury could base its finding of liability on race discrimination rather than retaliation. Likewise, because the instructions identified and defined each element of a retaliation claim, there was no need for the verdict form to do the same. *See, e.g.*, *Martin v. Howard Univ.*, 2006 WL 2850656, at *7 (D.D.C. Oct. 4, 2006) (holding that the verdict form in a Title VII retaliation case did not need to include specific language regarding material adversity because the jury instructions included the relevant standard). Nor were special interrogatories addressing the specific issues raised by the District necessary; given the clarity of the instructions, there was minimal risk that the jury would base its finding of liability on either activity that was unprotected by Title VII or action that did not rise to the level of material adversity.

### 5.      Other Asserted Errors

In the midst of its discussion of Dr. Lanier's charts, the District presents a list of thirteen other asserted errors that, it avers, collectively warrant a new trial. *See* Def.'s Mem. at 31–32. Each of these asserted errors is presented in bullet-point form, with almost no explanation and no supporting record or case citations (although some refer to the more detailed arguments discussed above). As plaintiffs observe, "[a] trial court is not required to 'parse through transcripts' in an effort to identify the grounds of a post-trial motion." *Warren*, 224 F.R.D. at 239 n.7 (quoting *Manion v. Am. Airlines, Inc.*, 217 F.R.D. 276, 278 n.3 (D.D.C. 2003)). Thus, this collection of scattershot objections does little to carry the District's "heavy burden" in showing that a new trial is warranted, *Webb v. Hyman*, 861 F. Supp. 1094, 1109 (D.D.C. 1994), especially given that the District fails to explain *how* any of these errors "result[ed] in a 'clear miscarriage of justice.'" *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d at 87 (quoting *Warren*, 224 F.R.D. at 239). Nevertheless, the Court will briefly address some of these contentions.

First, the Court did not err by admitting the District's position statements (the redaction of which is discussed above); as the Court has already explained, the District's position statements illustrated that it had offered shifting and arguably inconsistent explanations for the challenged employment actions and were thus probative of pretext. *See supra* section III.1.3.b.i; *see also Am. Ctr. for Int'l Labor Solidarity v. Fed. Ins. Co.*, 548 F.3d 1103, 1105 (D.C. Cir. 2008) (noting that "position statements submitted by the charged party [during an administrative process] may all be admissible as relevant evidence in subsequent litigation").

Second, the propriety of the Court's rulings preventing the District from introducing evidence intended to rebut testimony about Miller's character is irrelevant, because the District

expressly states that it is *not* moving for a new trial as to Miller's claim.  Any error regarding evidence relevant *only* to Miller's claim is thus immaterial here.

Third, the Court did not err by excluding evidence that Groomes, Steward, Wilson, and Wilkins "exercised their discretion favorably" toward Smalls, Caudle, and Goins after May 2006. As plaintiffs correctly observe, *see* Pls.' Opp'n at 60–61, these officials' completion of apparently routine paperwork related to plaintiffs is largely irrelevant to whether there was a causal connection between plaintiffs' protected activity and the specific materially adverse actions discussed above.

Fourth, the Court did not err by allowing testimony regarding the dissolution of the Intel unit in 2008; contrary to the District's repeated assertions, plaintiffs have never offered that event as a separate materially adverse action, but rather as further evidence that their original transfers to the Intel unit were adverse. *See* Pls.' Opp'n at 41.  Because the dissolution of the Intel unit supports plaintiffs' position that the unit itself was largely redundant and unnecessary, this testimony was relevant and admissible.

And finally, the Court did not wrongly prevent the District from questioning Groomes about her formation of a specialized juvenile unit in the Third District or her receipt of James's and Caudle's applications to join the Special Operations Division.  On the contrary, the District was allowed to question Groomes on both topics.  *See* Trial Tr. 52–54, June 23, 2010 .  The Court sustained objections only to questions that were beyond Groomes's personal knowledge (such as plaintiffs' reasons for applying to the Special Operations Division, Trial Tr. 53, June 23, 2010) or simply irrelevant (such as whether the Third District juvenile unit was successful, Trial Tr. 178, June 22, 2010).

36

* * *

In light of the foregoing, the District's motion for a new trial must be denied. The District has not established that "the jury verdict was a 'seriously erroneous result' and [that] denial of the motion will result in a 'clear miscarriage of justice.'" *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d at 87 (quoting *Warren*, 224 F.R.D. at 239).

## C.     Remittitur

Finally, the District challenges the amounts of the jury's damage awards: $200,000 each to Caudle and Goins, and $250,000 each to James and Smalls. *See* Verdict Forms [#283].[22]   The District argues that these awards were influenced by the overtime charts discussed above and were improperly punitive. The District suggests that Caudle, James, Goins, and Smalls should receive $10,000, $7,000, $6,500, and $5,000, respectively (although it offers no basis for these figures). Plaintiffs rejoin that the jury's awards were reasonable and based on the evidence adduced at trial.

Before turning to the evidentiary basis for the jury's decisions, the Court must address the proper methodology for gauging the propriety of a damage award. As noted above, a jury's award will be reduced only where "(1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Peyton*, 287 F.3d at 1126 (citing *Jeffries*, 822 F.2d at 96; *Williams*, 494 F.2d at 1085). The District contends that, in making these assessments, the Court should rely on the factors enumerated in *Nyman v. FDIC*, 967 F. Supp. 1562 (D.D.C. 1997), which include: the evidence produced at trial, damage awards

---

[22]     Miller received no damage award.

37

in similar cases, and both Title VII's provision for compensatory damages and its cap of those damages at $300,000 (for employers with more than 500 employees). *Id.*; *see* 42 U.S.C. § 1981a(b)(3). In considering the propriety of a $300,000 award, the *Nyman* court concluded that "the maximum amount recoverable under the applicable cap . . . should be reserved for the most egregious cases of unlawful conduct." *Nyman*, 967 F. Supp. at 1572.

Relying on *Nyman*, the District makes a similar argument here. But, as plaintiffs observe, the D.C. Circuit has expressly rejected this position, finding "no authority for the proposition that cases involving some perceived or even evident degree of injury less than the most egregious must inherently be awarded some figure lower than the cap." *Peyton*, 287 F.3d at 1127. The *Peyton* court also cautioned against relying too heavily on comparisons to other cases, given "the unique circumstances of each case as well as the adjustments which would necessarily have to be made for inflation." *Id.* (quoting *Mariner v. Marsden*, 610 P.2d 6, 16 (Wyo. 1980)). "Rather, the proper approach is to determine whether the judgment awarded . . . is supported by evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable." *Id.* Thus, the Court will not attempt to place plaintiffs' injuries on some hypothetical sliding scale of egregious employer conduct, and will instead focus on whether the jury's awards are supported by the evidence adduced at trial.

At trial, each plaintiff who received a damage award testified at length about the impact of the FMU reorganization process. James described feeling "embarrassed," "humiliated," "upset," "destroyed," and "devastated" by the District's conduct. Trial Tr. 41, 42, 50, 88, June 15, 2010. He characterized his removal from the FMU as a "slap in [the] face" that made him feel "laughed at," saying that it "felt like a mother telling her child he has to leave home, he has

38

to leave his family behind." Trial Tr. 69, 74, June 15, 2010.  He described going back to patrol as "[l]ike starting all over again."  Trial Tr. 93, June 15, 2010.  He also said that he had felt depressed and humiliated every day since being removed from the FMU, and that he frequently cried as a result.  Trial Tr. 99, June 15, 2010.  And he testified that his depression has caused "headaches, stomach pains, and verbal altercations with [his] wife."  Trial Tr. 99, June 15, 2010.

Smalls similarly reported feeling anger, humiliation, and sadness at being removed from the FMU; he described the frustration of feeling that his peer officers believed that he had done something wrong to warrant being reassigned, whereas he felt that he had acted properly in speaking up.  Trial Tr. 140–41, June 30, 2010.  He also described a spike in his blood pressure during the summer of 2006.

Likewise, Caudle testified that he felt hurt, embarrassed, and devastated.  Trial Tr. 34, 41, June 30, 2010.  He described the humiliation of going from FMU Officer of the Year to a patrol position, saying that his "pride was pretty much taken from all the hard work" he did, only to have that pride of accomplishment taken away unexpectedly and unfairly.  Trial Tr. 46, June 30, 2010.  He explained that colleagues now "stare at [him] funny" and question his work ethic.  Trial Tr. 46, June 30, 2010.  And he described experiencing headaches and trouble sleeping.  Trial Tr. 46, June 30, 2010.

Similarly, Goins described being replaced by less experienced officers as "a slap in [the] face" and "an insult."  Trial Tr. 120, June 28, 2010.  He testified that it was embarrassing, humiliating, and stressful to have to "go into [his] office and clean out [his] desk in front of [his] co-workers."  Trail Tr. 12, June 29, 2010.  And he characterized being sent back to patrol as "like starting all over again" and being "bust[ed] back down to the bottom."  Trail Tr. 24, June 29,

39

2010.  He also described experiencing frequent (sometimes daily) headaches, which forced him to seek medical treatment, and said that these events still impact his daily life.  Trail Tr. 26, June 29, 2010.

Contrary to the District's assertions, all of the foregoing testimony is "competent record evidence" that supports the jury's damage awards.  *See Peyton*, 287 F.3d at 1127 (affirming a damage award in a Title VII case based in part on "feelings of depression and sadness typical of plaintiffs in Title VII cases" (internal quotation marks omitted)); *Medina v. District of Columbia*, 718 F. Supp. 2d 34, 57–58 (D.D.C. 2010) (finding that the plaintiff, an MPD officer, had produced sufficient evidence to support a jury award by describing his "anguish, anxiety," and loss of professional reputation), *rev'd on other grounds*, 643 F.3d 323 (D.C. Cir. 2011).  Each plaintiff testified to the severe emotional and professional impact of the District's actions.  That testimony is an adequate basis for the jury's awards.

The District, however, argues that two aspects of the jury's awards demonstrate that they were based on improper considerations.  First, the District contends that Caudle and Goins received the same $200,000 award despite experiencing different harms, thus establishing that the jury "did not consider each plaintiff's claim individually."  Def.'s Mem. at 46 (citing *Alexander v. City of Jackson*, 2008 WL 907658, at *4 (S.D. Miss. Mar. 31, 2008)).  The District makes the same argument as to James and Smalls, who each received $250,000.  But, as plaintiffs point out, the fact that the jury did differentiate between Caudle and Goins on one hand and James and Smalls on the other (and awarded Miller nothing) actually *suggests* individualized consideration.  And this case is unlike *Alexander* — which the District calls "virtually identical" — where the issue was the jury's failure to distinguish between types of damages, not between

plaintiffs.   *See* 2008 WL 907658, at *4.   For example, the jury awarded one of the *Alexander* plaintiffs exactly $25,084.26 for each of the four categories of damages available (past physical harm, future physical harm, past emotional and mental harm, and future emotional and mental harm).   *Id*.   The *Alexander* court understandably concluded that it was incredibly unlikely that the jury had actually decided that the plaintiff had experienced precisely $25,084.26 worth of harm in each of those four categories; hence the court's conclusion that the jury "simply picked a figure" without regard for the evidence.   *Id*.   There was no equivalent, blatant failure to consider the facts here.[23]

Second, the District contends that the jury must have been influenced by Dr. Lanier's back-pay charts because it awarded Miller (who did not appear on the charts) nothing, but awarded the other four plaintiffs (who did) substantial sums.   This argument fares no better.   As plaintiffs point out, if the jury had pegged its awards to the back-pay charts, Smalls would have received the lowest award, not the highest, and Smalls and James would not have received the same award.   *See* Pls.' Opp'n Ex. 44 (Pls.' Trial Ex. 11A, overtime summary tables).   And the District's argument fails to account for the fact that the jury awards are an order of magnitude *larger* than the back-pay totals on the charts.   If the jury had improperly relied on these figures, the damage awards would presumably resemble them more closely.

In sum: the jury's awards were supported by the evidence adduced at trial and do not appear to be based on improper considerations.   Thus, the Court cannot conclude that the awards

---

[23]   Further, the *Alexander* court was ruling on a motion for a new trial, not a motion for remittitur; thus, it was not applying the standard that governs here.   *See Alexander*, 2008 WL 907658, at *2.   And it had other reasons to doubt that the jury had carefully considered the evidence presented at trial.   *See id*. at *4.

shock the conscience or obviously exceed the maximum bounds of reasonableness.  *See Peyton*, 287 F.3d at 1126.  Accordingly, the District's motion for remittitur must be denied.

## IV.  CONCLUSION

For the foregoing reasons, the District's motion must be denied in its entirety.

Accordingly, it is this 19th day of August 2011 hereby

**ORDERED** that the District of Columbia's motion for judgment as a matter of law, a new trial, and remittitur [#297] is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge
