**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FRAZIER CAUDLE, et al.,**<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>        **Defendant.** | **Civil Action 08-00205 (HHK)** |

**MEMORANDUM OPINION**

Following a jury trial in this case, verdicts were returned for plaintiffs Frazier Caudle, Nikeith Goins, William James, Sholanda Miller, and Donald Smalls. The jury determined that the District of Columbia Metropolitan Police Department ("MPD") had retaliated against plaintiffs in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs now move for equitable relief: an award of back-pay, an order requiring the District to transfer them to a different MPD district, and an injunction barring the District from retaliating against them again [#301]. Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion must be granted in part and denied in part.

**I.  BACKGROUND**

In the summer of 2006, the five plaintiffs were members of the MPD First District Focus Mission Unit ("FMU"), a specialized plainclothes unit composed of "productive" patrol officers who "graduated to" FMU duty. *See* Trial Tr. 165–66, 169, June 15, 2010 (test. of Capt. Ralph McLean). Goins was part of the FMU's auto theft section; the other plaintiffs were part of its

vice unit.  After Lieutenant Ronald Wilkins took charge of the FMU, plaintiffs, who are African American, came to feel that they were being treated differently from their Caucasian colleagues. They believed that Wilkins, who is Caucasian, was discriminating against them because of their race.  *See, e.g.*, Trial Tr. 111, June 28, 2010.  After a failed attempt to meet with the First District Commander, Diane Groomes, about Wilkins's behavior, Caudle, James, Miller, and Smalls enlisted the help of Caudle's fiancé, an attorney, in drafting an anonymous letter to Groomes expressing their concerns about Wilkins.  *See* Trial Tr. 22–23, June 15, 2010; Trial Tr. 124–25, June 30, 2010.  The letter was sent to Groomes on June 16, 2006.  *See* Pls.' Opp'n Ex. 20 (unsigned letter to Diane Groomes, June 16, 2006).  Goins, who was not involved in the production of the unsigned letter, complained orally to Wilkins about Wilkins's conduct on numerous occasions.  Trial Tr. 113, June 28, 2010.

On June 25, Officer Chanel Howard, also a member of the FMU, sent an email to Groomes expressing her belief that Caudle, James, Miller, and Smalls were behind the anonymous letter.  Trial Tr. 17–18, June 21, 2010; Trial Tr. 23–24, June 22, 2010.  Wilkins likewise speculated that those officers were responsible for the letter.  Trial Tr. 28–30, June 24, 2010.  Shortly after receiving the letter, Groomes called a meeting of all FMU officers, at which she "explained to them that [she] was in receipt of a letter of complaint and went over parts of what the complaint was."  Trial Tr. 19, June 22, 2010.  After discussing the complaint, Groomes asked the FMU officers whether "they could work together as a unit."  Trial Tr. 21, June 22, 2010.  During the meeting, many of the FMU officers spoke; according to plaintiffs, the other officers appeared to know who was behind the unsigned complaint, and many officers "t[ook] shots at" plaintiffs.  Trial Tr. 130, June 30, 2010.

Soon thereafter, Groomes decided to require the FMU officers to submit applications to remain in the unit, an apparently unprecedented step that she described as motivated by performance concerns.  Trial Tr. 24–25, June 22, 2010.  Caudle, James, Smalls, and Goins each submitted an application to remain in the FMU.  Trial Tr. 51, June 15, 2010; Trial Tr. 115, June 28, 2010; Trial Tr. 34, 134, June 30, 2010.

Plaintiffs were concerned that the reapplication process was a ruse designed to allow their removal from the unit because of their complaints about Wilkins.  While the applications were pending, Caudle, James, Miller, and Smalls, who had for some time patrolled together in an unmarked car, were forced to split up and ride with other officers.  Trial Tr. 44–45, June 15, 2010; Trial Tr. 32–33, 131, June 30, 2010.  They were also excluded from certain FMU operations.  Trial Tr. 42, June 15, 2010; Trial Tr. 131–33, June 30, 2010.  Believing these changes to be retaliatory, all five plaintiffs, along with Greg Philpotts, another FMU officer, drafted (and signed) a second written complaint, which they sent to the D.C. Office of Human Rights and the U.S. Department of Justice on August 24, 2006.  *See* Pls.' Opp'n Ex. 29 (August 24, 2006 written complaint).

When the reapplication process was complete, each plaintiff's application was denied, and each was replaced by an officer from the patrol unit.  Trial Tr. 41, 139–40, June 30, 2010.  Plaintiffs, who had been praised by their supervising sergeants as effective and capable officers, *see, e.g.*, Trial Tr. 206–09, June 24, 2010, were devastated.  *See, e.g.*, Trial Tr. 120, June 28, 2010.  Caudle, who had previously been named FMU Officer of the Year, was sent back to the patrol unit, which he found "embarrassing and humiliating."  Trial Tr. 41, June 30, 2010.  James, Smalls, and Goins were assigned to a newly created "Intel" unit, of which they were the only

3

members.  Trial Tr. 143–44, June 30, 2010.  The Intel unit was eventually dissolved, and James,

Smalls, and Goins were returned to patrol positions.  Trial Tr. 92, June 15, 2010.  Miller, who

had previously requested a transfer to the patrol day shift to allow her to care for her child, Trial

Tr. 44, June 21, 2010, was instead assigned to the patrol evening shift.  Trial Tr. 74, June 21,

2010; Trial Tr. 121, June 22, 2010.

Believing that these events were in retaliation for their complaints of discrimination,

plaintiffs filed this action against the District.    Following a jury trial, the jury found for

plaintiffs, awarding Caudle and Goins $200,000 each, James and Smalls $250,000 each, and

Miller no damages.  Soon thereafter, the District filed a motion for judgment as a matter of law, a

new trial, or remittitur of the jury's damage awards, which the Court denied, *see Caudle v.*

*District of Columbia*, 2011 WL 3632211 (D.D.C. Aug. 19, 2011), and plaintiffs filed the present

motion.

## II.  ANALYSIS

"[O]ne of the central purposes of Title VII is 'to make persons whole for injuries suffered

on account of unlawful employment discrimination.'"  *Franks v. Bowman Transp. Co., Inc.*, 424

U.S. 747, 763 (1976) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)).

Accordingly, Title VII expressly provides for a wide range of remedies:

> If the court finds that the [defendant] has intentionally engaged in . . . an unlawful
> employment practice charged in the complaint, the court may enjoin the [defendant]
> from engaging in such unlawful employment practice, and order such affirmative
> action as may be appropriate, which may include, but is not limited to, reinstatement
> or hiring of employees, with or without back pay. . . *or any other equitable relief as
> the court deems appropriate*.

42 U.S.C. § 2000e-5(g)(1) (emphasis added).  In considering what remedy is appropriate, the

4

Court "must strive to grant 'the most complete relief possible.'" *Lander v. Lujan*, 888 F.2d 153, 156 (D.C. Cir. 1989) (quoting *Franks*, 424 U.S. at 764). In other words, the Court's goal is to restore the plaintiffs, as nearly as possible, to the circumstances they "would have occupied if the wrong had not been committed." *Id.* (quoting *Albemarle Paper*, 422 U.S. at 418–19) (internal quotation marks omitted).

Here, plaintiffs seek three types of relief: (i) back-pay damages to compensate for the overtime opportunities they lost as a result of the District's retaliatory conduct; (ii) an order requiring the District to transfer them from the First District (where they worked during 2006 and, with the exception of Miller and Smalls, still work) to the Second District; and (iii) an injunction barring the District from retaliating against them again. The Court will address each request in turn.

## A.      Back Pay

First, Caudle, Goins, Smalls, and James request an award of back pay to compensate for the overtime opportunities they lost as a result of their transfers from the FMU. At trial, these plaintiffs each testified that their transfers resulted in diminished opportunities to earn overtime pay, in particular because they had fewer chances to make arrests and appear in court. *See* Trial Tr. 85–86, June 15, 2010; Trial Tr. 19–20, June 29, 2010; Trial Tr. 45, 148–49, June 30, 2010. Plaintiffs also presented testimony from Dr. Louis Lanier, an expert economist, who quantified plaintiffs' lost overtime pay, both by comparing plaintiffs pre- and post-transfer overtime hours and by comparing plaintiffs' post-transfer overtime to hours to those of the officers who remained in the FMU after it was organized. *See* Trial Tr. 166–67, 175, June 29, 2010; Pls.' Mot. for Equitable & Inj. Relief ("Pls.' Mot.") Ex 2 (Pls.' Trial Ex. 11A, overtime summary

tables).  Lanier based his analysis entirely on pay data provided by the MPD, both for the individual plaintiffs and for "every employee of the FMU who worked there between . . . January 1st, 2003, and May 31st, 2010."  Trial Tr. 166, June 29, 2010.  Ultimately, Lanier concluded that the individual plaintiffs had lost the following amounts: Caudle, $36,454; Smalls, $14,399; James, $51,666; and Goins, $36,785.  *See* Pls.' Mot. Ex 2 (Pls.' Trial Ex. 11A, overtime summary tables) at T.5.

On the basis of this testimony, plaintiffs now request that each of these four plaintiffs be awarded the amount that Lanier found him to have lost, plus prejudgment interest.  *See* Pls.' Mot. at 6–8.  The District makes several responses, none of which is availing.

First, the District argues that the individual plaintiffs each admitted to not knowing how much overtime they lost, "and, therefore, offered no reliable evidence to support their respective claims."  Def.'s Opp'n to Pls.' Mot. ("Def.'s Opp'n") at 3.  But alone, this argument proves nothing; the entire purpose of Lanier's expert testimony was to quantify the amount of overtime that plaintiffs lost, because they could not do so themselves.

Second, the District contends that Lanier's statistical methodology was unreliable because it disregarded certain provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., and the District's municipal regulations, and therefore overcounted the number of overtime hours that plaintiffs would have worked had they remained in the FMU.  But, as plaintiffs point out, Lanier's overtime determinations were based solely on the data provided by the MPD, which identified hours worked as regular, overtime, or court-overtime.  *See* Pls.' Reply Ex. 9 (sample pay data); Trial Tr. 165, June 29, 2010 ("Q: Did you exercise any discretion regarding what was an overtime hour and what was not an overtime hour?  A: No.  I made no determination of that.

The data that were already provided had the overtime hours already marked.").  Thus, the District's data, rather than Lanier's methodology, were responsible for any errors in his overtime tabulations.

Third, the District challenges Lanier's methodology as "grounded upon no particular method or procedure," and "not tied to the facts of the case."  Def.'s Opp'n at 5–8.[1]  This argument is wholly without merit.  After establishing his credentials,[2] Lanier testified that his conclusions were based on a database of hours worked and pay stub data, both provided by the MPD, and explained that he reached those conclusions by conducting the comparisons described above.  Trial Tr. 165–167, 175, June 29, 2010.  Specifically, he explained that, to compare plaintiffs' pre- and post-transfer overtime hours, he "calculated the amount [of] overtime worked as a percentage of total paid hours . . . because [plaintiffs] didn't work exactly the same number of hours in the before period and the after period, and in order to be able to compare apples to apples, you have to express the overtime worked as a percentage of the total time worked."  Trial Tr. 167, June 29, 2010.  And he testified that he considered the overtime hours of the officers who remained in the FMU "to see if there was any change in the overtime being worked by those who remained in the FMU that might tend to explain the decreases in overtime that we see for the plaintiffs."  Trial Tr. 175, June 29, 2010.  It is thus obvious that Lanier's conclusions *were*

---

[1]   Here, the District retreads the meritless arguments that it used in its failed attempt to exclude Lanier's testimony in the first place.  *See* Def.'s Mot. *In Limine* to Exclude Pls.' Expert Economist [#198].

[2]   Lanier holds a B.S. and a Ph.D. in economics and works as an economics consultant, specializing in labor economics.  He has performed policy analysis for the government, and has previously served as a litigation consultant.  Trial Tr. 152–53, June 29, 2010.

based on a "particular method or procedure," and the District's unsupported assertions to the

contrary are "no more than unfounded lay opinion," amounting to "a failure of proof." *See* Order

of May 20, 2010 [#247] (denying the District's motion to exclude Lanier's testimony) (quoting

*Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075, 1113 (E.D. Cal. 2004))

(internal quotation marks omitted).  Likewise, Lanier's description of the basis for his

calculations — the overtime-hours and pay-rate data provided to him by the District — makes

clear that his conclusions were "tied to the facts of the case."

　　　　Fourth, the District attacks Lanier's conclusions as purely "speculative," arguing that "[i]t

is impossible to reconstruct what would have followed had the unit not been reorganized; thus,

Plaintiffs cannot meet their burden to establish the likelihood of damages."  Def.'s Opp'n at 6.

But calculating lost pay in a case like this necessarily involves some amount of estimation,

precisely because it is not possible to reconstruct with perfect accuracy the events that would

have occurred but for the defendant's unlawful conduct; "this speculative aspect should not deter

courts from fashioning awards that accomplish Title VII's goals of making a wronged plaintiff

whole."  *Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 14 n.6 (1st Cir. 1997); *see also Barbour v.

Merrill*, 48 F.3d 1270, 1280 (D.C. Cir. 1995) (holding that "a district court should not refuse to

award front pay merely because *some* speculation about future earnings is necessary").[3]  Here, the

---

　　　　[3]　　　*Cf. Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234–35 (D.C. Cir. 1997) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.  In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)) (internal quotation marks omitted)).

fact that Lanier necessarily had to rely on certain basic assumptions, *see, e.g.*, Trial Tr. 187, June 29, 2010, does not undermine the validity of his conclusions or his methodology, especially given the District's failure to offer any evidence or expert testimony that called those assumptions into question.

Finally, the District contends that any back-pay award to plaintiffs should be reduced because, by voluntarily moving from the patrol evening shift to the patrol day shift after their transfers, plaintiffs failed to mitigate their damages.  According to the District, the patrol day shift offers fewer overtime opportunities because court proceedings occur during the day; thus, an officer whose normal shift is in the evening earns overtime for appearing in court, whereas an officer who normally works during the day does not.  But, as the party liable for an unlawful employment practice, the District bears the burden of establishing the facts of plaintiffs' failure to mitigate.  *See Fogg v. Gonzales*, 492 F.3d 447, 455 (D.C. Cir. 2007); *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002).  And conspicuously absent from the District's opposition brief are any *facts* — as opposed to unsupported assertions by counsel — supporting the District's argument or establishing the extent of plaintiffs' alleged failure to mitigate.  This lapse is especially problematic given that, as plaintiffs point out, Pls.' Reply at 7 n.11, the District's argument relates to only one type of overtime; plaintiffs' non-court, FMU-specific overtime opportunities were terminated by their transfers, and were thus not impacted by their subsequent shift changes.  In light of the District's inability to put forward any exhibits or calculations supporting its argument — or even to hazard a guess at the amount that plaintiffs' back-pay awards should be reduced — the Court concludes that the District has not carried its burden with regard to mitigation.

In sum: plaintiffs' back-pay claims are supported by the expert testimony adduced at trial, and all of the District's objections thereto are meritless.  Accordingly, the Court concludes that each plaintiff is entitled to a back-pay award in the amount given by Dr. Lanier: Caudle, $36,454; Smalls, $14,399; James, $51,666; and Goins, $36,785.  *See* Pls.' Mot. Ex 2 (Pls.' Trial Ex. 11A, overtime summary tables) at T.5.  Plaintiffs are also entitled to prejudgment interest at the prime rate for each year between plaintiffs' removals from the FMU and the present (unless the parties agree on another rate).  *See Loeffler v. Frank*, 486 U.S. 549, 558 (1988); *Chadwick v. District of Columbia*, 56 F. Supp. 2d 69, 73 n.2 (D.D.C. 1999) (citing *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C. Cir. 1996)).

B.    **Transfers to the Second District**

As described above, the District's retaliatory actions against plaintiffs took place in the MPD's First District.  Plaintiffs argue that Caudle, James, and Goins, who still serve in the First District, should be transferred to the Second District in order to insulate them from the continuing hostility and discord caused by the events underlying this case.[4]  The District counters that a transfer is unwarranted because there is no indication of ongoing retaliation in the First District, neither Groomes nor Wilkins works in the First District anymore,[5] and a transfer to the Second District would not return plaintiffs to the positions they occupied prior to the District's

---

[4]    The First District covers a portion of the District of Columbia that is bordered on the south by the Potomac and Anacostia rivers and on the north by New York Avenue NW and Florida Avenue NE.  The Second District spans a larger, roughly triangular section of the city, bounded by the Potomac river, Western Avenue NW, and Rock Creek Park.  *See Police Districts & PSAs*, METROPOLITAN POLICE DEPARTMENT, http://mpdc.dc.gov/mpdc/cwp/view,a,1239,Q, 543336,mpdcNav_GID,1523,.asp (last visited Aug. 19, 2011).

[5]    Groomes is now Assistant Chief in charge of Patrol Services and the School Security Bureau, and Wilkins now works in the Fifth District.

retaliatory conduct.  On this point, the District has the stronger position.

At trial, plaintiffs testified that, since their removals from the FMU, they have felt

excluded, stared at, gossiped about, and mocked by other First District officers.  *See, e.g.*, Trial

Tr. 45–46, June 30, 2010 (test. of Frazier Caudle).  On this basis, they now ask to be transferred

to the Second District, where they will not be "surrounded by officers and officials who have

formed settled opinions about Plaintiffs' complaints and their efforts to vindicate their rights."

Pls.' Mot. at 10.  Although the Court is not unsympathetic to plaintiffs' request, three facts

militate against the relief they seek.

First, because Groomes and Wilkins have both left the First District (and because

Groomes has been promoted), plaintiffs are already outside of Wilkins's chain of command, and

would remain within Groomes's authority anywhere in the city.  Thus, plaintiffs' requested

transfers would not place them beyond the authority of those who were responsible for the

retaliation against them.  *Cf. Webb v. Hyman*, 861 F. Supp. 1094, 1117–18 (D.D.C. 1994)

(ordering the defendant to transfer the plaintiff beyond the authority of the superior who sexually

harassed her).

Second, as described by plaintiffs at trial, the ostracism that they have experienced is not

so severe as to "make[] an amicable and productive work relationship impossible."  *Cox v.

Dubuque Bank & Tr. Co.*, 163 F.3d 492, 498 (8th Cir. 1998) (affirming an award of front pay in

lieu of reinstatement where hostility would make reinstatement impracticable).  That other First

District officers have "formed settled opinions" about the events underlying this case or have

"talked about Plaintiffs' protected activity," Def.'s Mot. at 10, does not establish that plaintiffs

cannot work productively in the First District, especially in the absence of testimony or evidence

regarding plaintiffs' relationships with their present supervisors.

Third, ordering the MPD to transfer plaintiffs from one district to another would constitute a significant intrusion into the operations of both districts.  When fashioning remedies under Title VII, courts attempt not to "interfere with the policymaking and personnel decisions that rightly belong to public servants."  *Jones v. Rivers*, 732 F. Supp. 176, 178 (D.D.C. 1990).  Although that goal is ultimately secondary to Title VII's core purpose of making a plaintiff whole, *see Lander*, 888 F.2d at 158, it is nevertheless a factor to be considered.

In light of these considerations, the Court must conclude that plaintiffs' requested transfers are unwarranted.  Transferring plaintiffs would not restore their lost overtime opportunities or the other perks of FMU duty, and does not appear necessary to enable plaintiffs to work productively as MPD officers.  Plaintiffs' desire for a fresh start is understandable, but the Court does not believe that the measure by which they hope to achieve that fresh start is appropriate here.[6]

## C.     Injunction Against Further Retaliation

Lastly, plaintiffs request an injunction barring the District from engaging in any further unlawful retaliation against them.  Plaintiffs contend that this step is warranted by the high rank of the officials involved and the continued possibility of retaliation created by plaintiffs' ongoing employment with the MPD.  The District, terming plaintiffs' requested remedy an "obey the law injunction," rejoins that such measures are improper under the Federal Rules of Civil Procedure.

---

[6]     In so holding, the Court does not endorse the District's repeated, outlandish assertions that plaintiffs' request to be transferred illustrates "a willingness to seek improper benefits for themselves" and demonstrates that plaintiffs' "entire claim of retaliation has been illegitimate *ab initio*."  Def.'s Opp'n at 3, 15.

The District's response is unavailing.

Title VII expressly provides that, after a finding of liability, "the court may enjoin the [defendant] from engaging in [the] unlawful employment practice [in question]."  42 U.S.C. § 2000e-5(g)(1).  This remedy, which the Supreme Court has called "an important form of relief," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), is "typical" in this jurisdiction.  *Bass v. Tanoue*, 2001 WL 1659158, at *7 (D.D.C. Dec. 21, 2001); *see, e.g.*, *Jones v. Wash. Metro. Area Transit Auth.*, 205 F.3d 428, 435 (D.C. Cir. 2000) (affirming issuance of a permanent injunction prohibiting the defendant from taking "any form of retaliatory action" against the plaintiff); *Webb*, 861 F. Supp. at 1117–18 (ordering the defendants "to refrain from sexual harassment, sex discrimination or retaliation in any form against" the plaintiff); *Jones*, 732 F. Supp. at 178 ("[T]he District of Columbia will be enjoined from further discrimination against Joan Jones on the basis of sex and from any future acts of retaliation."); *Mitchell v. Sec'y of Commerce*, 715 F. Supp. 409, 410 (D.D.C. 1989) (granting a permanent injunction against future acts of discrimination or retaliation against the plaintiff, where he would continue to work for the defendant, which had exhibited some signs of resentment regarding the plaintiff's lawsuit).

Here, plaintiffs aver that such an injunction is warranted because of the ongoing possibility of further retaliation.  They point out that four of the five plaintiffs still work for the MPD, and the fifth (Miller) is seeking reinstatement.  And they further observe that their retaliation claim involved high-ranking MPD officials, including one (Groomes) who is now an Assistant Chief.  Plaintiffs' arguments are persuasive.  This dynamic — where both the plaintiffs and the parties responsible for the unlawful action they experienced continue to work for the

13

defendant — frequently justifies the issuance of an injunction, especially where the defendant has "taken no affirmative steps to prevent recurrence" of the misconduct in question. *See Bundy v. Jackson*, 641 F.2d 934, 946 n.13 (D.C. Cir. 1981); *see also Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001) (holding that an injunction was warranted under Title VII where both the plaintiff and "the two individuals who were most influential in [his] demotion" still worked for the defendant).[7]

The District offers the Court no basis to reach a different conclusion here. As noted above, the District attacks plaintiffs' proposed injunction as an improper "obey the law" injunction. But the District fails to grapple with the numerous authorities cited by plaintiffs authorizing injunctions just like the one requested here. And, in any event, an impermissible "obey the law" injunction is one that is not meaningfully more specific than the law in question. *See, e.g.*, *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (rejecting an injunction requiring the defendants "to act 'in full conformity with applicable laws pertaining to firearms,' and to 'adopt [ ] appropriate prophylactic measures to prevent violation' of those laws, without specifying which laws are 'applicable' or identifying the ways in which the defendants must alter their behavior to comply with those laws." (alteration in original)). The injunction requested here does not approach that problematic level of generality.

The District's remaining objections are equally unpersuasive. The fact that plaintiffs have not experienced retaliation *recently* is irrelevant; in rejecting the same argument, the D.C.

---

[7]     Strangely, the District attempts to distinguish *Bruso* by pointing out that, there, the managers responsible for the plaintiff's demotion "were still in '[defendant's] upper echelon of management,'" Def.'s Opp'n at 16 (quoting *Bruso*, 239 F.3d at 864) — a phrase that accurately describes Groomes's current Assistant Chief position.

Circuit has explained that "a suit for injunctive relief does not become moot simply because the offending party has ceased the offending conduct, since the offending party might be free otherwise to renew that conduct once the court denied the relief." *Bundy*, 641 F.2d at 946 n.13. Nor must plaintiffs affirmatively establish a likelihood of future retaliation; on the contrary, courts have awarded injunctions where the *defendant* has failed to show that future misconduct is unlikely. *See Bruso*, 239 F.3d at 864; *Bundy*, 641 F.2d at 946 n.13. And finally, the existence of an internal MPD policy forbidding retaliation — which, notably, was in place at the time of the unlawful retaliation that gave rise to this case — does not establish that an injunction is not necessary. In *Bundy*, a sexual harassment case against the District, the D.C. Circuit noted that the District's Mayor had issued an order prohibiting sexual harassment; the court concluded that the Mayor's order "d[id] not provide any certainty that the offending conduct will not recur," and called it "a useful supplement to . . . a District Court injunction." *Bundy*, 641 F.2d at 946 nn.13–14; *see also Bruso*, 239 F.3d at 864. So too here.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for equitable and injunctive relief [#301] is granted in part and denied in part. An appropriate order accompanies this Memorandum.

Henry H. Kennedy, Jr.
United States District Judge